1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8 | JERRY WHITE,                          Case No.: 3:04-cv-00412-GMN-CLB

9 |        Petitioner                           **Order**

10 | v.

11 | HAROLD WICKHAM, et al.,

12 |        Respondents.

13

14      Petitioner Jerry White filed a petition for writ of habeas corpus under 28 U.S.C. § 2254.

15 This matter is before this court for adjudication of the merits of the petition. For the reasons

16 discussed below, this court denies the petition, grants a certificate of appealability, and directs

17 the Clerk of the Court to enter judgment accordingly.

18                                      **Background**

19      White was charged with crimes related to events that occurred in Elko County, Nevada

20 on October 8, 1999. ECF No. 24 at 419. In its order affirming White's convictions, the Nevada

21 Supreme Court described the crime, as revealed by the evidence at White's trial, as follows:

22        On October 8, 1999, Ramon Navarro was robbed and bludgeoned to death in his
         home in Elko, Nevada. Navarro was seen earlier in the morning drinking at a local
23        bar with two individuals later identified as White and co-defendant Michael
         Woomer. Navarro left the bar in the company of White and Woomer.

Based on additional witness information, White and Woomer were identified as suspects. Woomer was arrested in Battle Mountain, Nevada, on October 9, 1999. White turned himself in to the custody of Santa Cruz, California, officials two days later on October 11, 1999. Each man gave statements to police officials. Each man asserted that, while present, the other had delivered the fatal blows to Navarro's head with an aluminum baseball bat.

ECF No. 25 at 136-37.

Following a jury trial, White was convicted of first-degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, and conspiracy to commit robbery with the use of a deadly weapon. ECF No. 24 at 419. White was sentenced to two life sentences without the possibility of parole for first-degree murder and the deadly weapon enhancement, 35 to 156 months for robbery with the use of a deadly weapon, and 13 to 60 months for conspiracy to commit robbery with the use of a deadly weapon. *Id.* at 420. White appealed, and the Nevada Supreme Court affirmed on March 8, 2002. ECF No. 25 at 136. Remittitur issued on April 2, 2002. ECF No. 25 at 145.

White filed a pro se state habeas petition and a counseled, supplemental state habeas petition. ECF No. 25 at 153, 186. The state district court denied the petition on October 15, 2003. ECF No. 25 at 290. White appealed, and the Nevada Supreme Court affirmed on July 8, 2004. ECF No. 25 at 386. Remittitur issued on August 3, 2004. ECF No. 25 at 395.

White filed a counseled, first amended federal habeas petition on June 17, 2005. ECF No. 19. The Respondents moved to dismiss the first amended petition on October 27, 2005. ECF No. 33. This court granted the motion in part. ECF No. 44. The Respondents answered the remaining grounds in White's first amended petition on November 27, 2006. ECF No. 54. White replied on March 19, 2007. ECF No. 61. This court denied White's petition on September 27, 2007. ECF

No. 62. White appealed. ECF No. 64. The United States Court of Appeals for the Ninth Circuit denied White's request for a certificate of appealability on April 23, 2008. ECF No. 68.

White sought application for authorization to file a second or successive federal habeas petition, which the United States Court of Appeals for the Ninth Circuit granted on January 21, 2010. ECF No. 69. Following this court's reopening of this action, White filed a counseled successor federal habeas petition on February 22, 2010. ECF Nos. 74, 75. The Respondents moved to dismiss White's successor petition on April 30, 2010. ECF No. 78. This court denied the motion without prejudice, pending White's exhaustion of his claim in the Nevada state courts, and granted White's request for the issuance of a stay and abeyance. ECF No. 91.

White filed a second state habeas petition on September 28, 2009. ECF No. 84-4. State district court Judge Andrew J. Puccinelli held an evidentiary hearing on White's second state habeas petition and then issued an order setting a briefing schedule. ECF No. 95-35 at 2. White filed an amended petition, but before Judge Puccinelli could rule on the petition, he passed away. *Id.* A second evidentiary hearing was held on White's petition before state district court Judge Nancy Porter. *Id.* Judge Porter denied White's petition. *Id.* at 10. White appealed, and the Nevada Supreme Court affirmed on November 24, 2015. ECF No. 95-44. Remittitur issued on December 21, 2015. ECF No. 95-45.

White sought reopening of his federal habeas action and leave to file an amended successor petition on February 3, 2016. ECF Nos. 94, 96. This court granted both requests. ECF No. 101. White filed his counseled, amended successor petition on July 3, 2017. ECF No. 103. The petition alleged one ground for relief: his conviction and sentence are invalid because he is actually innocent of first-degree murder, robbery and conspiracy to commit robbery. *Id.* The Respondents moved to dismiss White's amended successor petition. ECF No. 107. This court

3

1  denied the motion. ECF No. 121. The Respondents answered White's amended successor

2  petition on September 12, 2018. ECF No. 125. White replied on December 21, 2018. ECF No.

3  130.

4                                          **Discussion**

5  **A.      Standard of review**

6          28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas

7  corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

8          An application for a writ of habeas corpus on behalf of a person in custody pursuant
           to the judgment of a State court shall not be granted with respect to any claim that
9          was adjudicated on the merits in State court proceedings unless the adjudication of
           the claim –

10
        (1) resulted in a decision that was contrary to, or involved an unreasonable application
11          of, clearly established Federal law, as determined by the Supreme Court of the
            United States; or

12
        (2) resulted in a decision that was based on an unreasonable determination of the facts
13          in light of the evidence presented in the State court proceeding.

14  A state court decision is contrary to clearly established Supreme Court precedent, within the

15  meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing

16  law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that

17  are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*,

18  538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing

19  *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application

20  of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if

21  the state court identifies the correct governing legal principle from [the Supreme] Court's

22  decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75

23  (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state

1   court decision to be more than incorrect or erroneous. The state court's application of clearly

2   established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10)

3   (internal citation omitted).

4          The Supreme Court has instructed that "[a] state court's determination that a claim lacks

5   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

6   correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing

7   *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a

8   strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

9   at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

10  (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating

11  state-court rulings, which demands that state-court decisions be given the benefit of the doubt"

12  (internal quotation marks and citations omitted)).[1]

13

---

14       [1] White argues that AEDPA does not apply to, or is unconstitutional as applied to,
    freestanding claims of actual innocence because the constitutional right to present and obtain

15  relief for such a claim is a federal constitutional right, not a right rooted in the relief provided
    by 28 U.S.C. § 2254(d). ECF No. 130 at 71. Because White cannot meet 28 U.S.C. § 2254(d)'s

16  burden of relief and because this court is also not entirely convinced that White is an innocent
    individual, as is discussed further in this order, this court declines to determine that AEDPA

17  either does not apply to White's freestanding claim of actual innocence or that AEDPA is
    unconstitutional as applied to White's freestanding claim of actual innocence.

18
         Alternatively, White argues that AEDPA is unconstitutional generally, and as such, his

19  claim should be reviewed de novo. ECF No. 130 at 72. White argues: (1) 28 U.S.C. § 2254(d)
    "violates § 1 of the Fourteenth Amendment and the Due Process Clause of the Fifth

20  Amendment, by depriving citizens in state custody of their fundamental right to meaningful
    federal review of the federal legality of their state detention"; (2) 28 U.S.C. § 2254(d)

21  "unlawfully suspends the writ of habeas corpus, in violation of Article I, § 9, cl. 2"; and (3) 28
    U.S.C. § 2254(d) "unlawfully impinge[s] on the judicial power vested exclusively in the

22  judiciary by Article III." *Id.* at 73. White admits that his latter two arguments have been
    rejected by the Ninth Circuit, *id.* (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)), so

23  this court declines to consider them. With regard to his first argument—28 U.S.C. § 2254(d)
    violates the Fourteenth and Fifth Amendments—White argues that 28 U.S.C. § 2254(d)
    "requires federal courts to defer not only to state-court findings of fact, but remarkably, to the

**B.    Ground 1**

In Ground 1, White alleges that his conviction and sentence are invalid under the federal constitutional guarantees of due process of law and freedom from cruel and unusual punishment because he is actually innocent of first-degree murder, robbery, and conspiracy to commit robbery under any theories of liability. ECF No. 103 at 6. White elaborates that his co-defendant, Michael Woomer, recanted his police interview statements and trial testimony in which he accused White of murdering Navarro; instead, Woomer now confesses that he, and he alone, murdered and robbed Navarro while White was passed out in another bedroom. *Id.* White explains that Woomer's new testimony is consistent with the other evidence in the case and that Woomer has no motive to lie, as his new admissions hurt his ability to obtain parole.[2] *Id.* at 20-21.

In White's appeal of the denial of his second state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that the district court erred in denying grounds three through five of his petition as procedurally barred, because he has demonstrated that he is actually innocent such that the failure to consider those claims on their merits would result in a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995); *see also Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001) (adopting the *Schlup* test). To prove actual innocence as a gateway to reach procedurally-barred constitutional claims of error, a petition must show that "'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting

---

state court's interpretation of federal law, and thus to the state court system's self-assessment of its compliance with federal law." *Id.* at 78. This, White argues, requires a federal court to stay its hand and deny relief even in cases in which a state imprisonment truly violates the federal constitution. *Id.* This court finds that this argument lacks merit. Although not discussed in the context of the Fourteenth and Fifth Amendments, the Ninth Circuit has stated generally that "[t]he constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute." *Crater*, 491 F.3d at 1129.

[2] It appears that, following the briefing of this petition, Woomer was granted parole on or about July 17, 2019, ten years after he originally recanted his story.

*Schlup*, 513 U.S. at 327); *see also Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. Appellant has failed to demonstrate a gateway claim of actual innocence.

"To be credible, a claim of actual innocence must be based on reliable evidence." *Calderon*, 523 U.S. at 559 (internal quotations omitted). In his recantation and evidentiary-hearing testimony, Woomer took sole credit for thinking up and carrying out the robbery and murder, indicating that appellant was in no way involved. The district court clearly did not consider Woomer to be credible or reliable. Woomer's recitation of events in his declaration and postconviction testimony, if believed, would have absolved appellant of any of the crimes with which he was charged. But despite Woomer's recantation, the district court nevertheless found that the evidence does not support that appellant is actually innocent of the crimes for which he was convicted. We defer to the district court's implicit findings regarding Woomer's credibility, which are supported by substantial evidence in the record. *See State v. Rincon*, 122 Nev. 1170, 1177, 147 P.3d 233 238 (2006) ("[T]he district court is in the best position to adjudge the credibility of the witnesses and the evidence, and unless this court is left with the definite and firm conviction that a mistake has been committed, this court will not second-guess the trier of fact." (internal quotations omitted)).

Moreover, the district court's finding that appellant failed to demonstrate that he was actually innocent is also supported by substantial evidence in the record. Appellant was convicted of robbery with use of a deadly weapon, conspiracy to commit robbery, and first-degree murder with use of a deadly weapon. The trial testimony of other witnesses was that appellant left the crime scene carrying a bat covered in the victim's blood and was in control of the proceeds of the robbery, supporting that appellant was an active participant in the illegal activity. And one of the theories of first-degree murder was felony murder, such that if appellant had not struck the fatal blows, he would nevertheless have been convicted of first-degree murder. *See* NRS 200.030(1)(b). Accordingly, appellant has failed to demonstrate that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. For this same reason, we conclude that the district court did not err in denying appellant's freestanding claim of actual innocence in which he requested a new trial on the basis of newly discovered evidence (Woomer's recantation of his trial testimony). *See Schlup*, 513 U.S. at 316-17 (suggesting that the test for any freestanding claim of actual innocence would be more stringent than that for a gateway claim); *Callier v. Warden*, 111 Nev. 976, 990, 901 P.2d 619, 627-28 (1995) (setting out a four-element test for determining whether a petitioner is entitled to a new trial based on newly discovered recantation, the fourth element being that "it is probable that had the false testimony not been admitted, a different result would have occurred at trial").

ECF No. 99-44 at 4-6.[3]

**1.      Facts**

      **a.      Woomer's police interview statements and plea**

Law enforcement interviewed Woomer on October 10, 1999. ECF No 72-4. During that interview, Woomer stated that he and White went to Navarro's house in Elko, Nevada after leaving a bar. *Id.* at 9. While Woomer was listening to music in the living room and after White and Navarro "engaged in some type of sexual activity," White "walk[ed] in with the baseball bat. Hit[ ] the guy a couple of times in the head and in the back and everything and sa[id] give me your money." *Id.* at 9, 17. During this time, Woomer "was passed out . . . dazed" and had previously vomited from consuming alcohol. *Id.* at 11, 21.

On January 26, 2000, Woomer entered into a guilty plea agreement whereby he agreed to plead guilty to first-degree murder in return for the State dismissing the remaining charges against him: open murder with the use of a deadly weapon, robbery with the use of a deadly weapon, conspiracy to commit open murder with the use of a deadly weapon, and conspiracy to commit robbery with the use of a deadly weapon. ECF No. 72-7 at 2-3. Woomer "agree[d] to be interviewed by the District Attorney's Office and their investigators" and "to testify with respect to Mr. White's involvement in th[e] case." *Id.* at 3.

Law enforcement interviewed Woomer again on February 15, 2000. ECF No 72-6. Woomer explained that after he, White, and Navarro went to Navarro's house, Navarro started flirting with him, kissing him, and "sucking on [his] neck." *Id.* at 3. Woomer and Navarro then made a deal that Navarro would "pay [Woomer] for giving [Woomer] a blow job." *Id.* Woomer

---

     [3] This court previously concluded that the state district court and the Nevada Supreme Court addressed White's freestanding actual innocence claim on the merits, such that his actual innocence claim was not procedurally defaulted. ECF No. 121 at 5-6.

was unable to get an erection, so he smoked some marijuana and then "started to feel

nauseous, . . . so [he] got up and [he] ran to the bathroom and [he] vomited." *Id.* Woomer then

heard White demanding Navarro give White his money, and when Woomer exited the bathroom,

he saw White "beating [Navarro] with the baseball bat in the living room area." *Id.* White

instructed Woomer to search Navarro's residence, and when Woomer returned to the living

room, Navarro had regained consciousness and "started charging [White]." *Id.* White hit Navarro

again with the bat, and then Woomer "kicked [Navarro] a couple of times." *Id.* at 4. Woomer

then went outside, and White came out shortly after saying "he got the money[,] let's go." *Id.*

Thereafter, on March 30, 2000, Woomer was sentenced to life with the possibility of

parole after twenty years. ECF No. 72-8 at 3.

### b.      White's trial

White's trial began on November 9, 2000. ECF No. 72-9. Nevada Highway Patrol

Trooper Donald Neff stopped a silver Buick near Wells, Nevada on October 7, 1999, because it

lacked a front license plate. *Id.* at 27-28. White was the driver of the vehicle, and a shorter,

stockier man, who he later identified as Woomer, was in the passenger seat. *Id.* at 31, 35. White

indicated that he and Woomer were on their way to California, that his name was Raymond

Huffman, that he had taken a license plate off of a Pontiac and put it on the Buick, and that he

did not have a driver's license. *Id.* at 32-33. Trooper Neff located an aluminum baseball bat in

White's vehicle during a search. *Id.* at 36. After issuing three citations to White, Trooper Neff

advised White to drive to Elko to obtain a temporary moving permit. *Id.* at 38-39.

Wendy Parman provided a room to White and Woomer at the Western Inn in Elko on

October 7, 1999. ECF No. 72-9 at 47-50. The next morning, October 8, 1999, Paul Newgard, a

bartender at the Scooter Inn in Elko, observed White and another individual at the Scooter Inn

bar with Ramon Navarro, an individual they had met at the bar. ECF No. 72-9 at 53, 56-58, 71. The three individuals consumed beer until approximately 10:00 or 10:30 that morning before leaving the bar together. *Id.* at 56-58. Navarro "had a rather large amount of bills" on his person that morning. *Id.* at 73.

Teresa Jones was sitting on her front porch in Elko at approximately 11:30 in the morning on October 8, 1999, when she saw two men leave the house next door. ECF No. 72-9 at 109-110. One of the individuals "was outside of the house, standing alongside the sidewalk" for about five minutes, then he "went back up to the door and hollered in and started to walk down the steps, and another man joined him from inside the house." *Id.* at 110-111, 115. The first individual, who was shorter, yelled "'[w]rap it up' or 'wrap that up.'" *Id.* at 113-114. The second individual, who was tall and skinny, came out of the house with a baseball bat. *Id.* at 114. The two individuals then started running down the street. *Id.* at 115.

Wilfredo Cervantes, Navarro's roommate, came home from work on October 8, 1999, at 7:00 in the evening and found Navarro "on his knees on the bed." ECF No. 72-9 at 130, 133, 135. Navarro was not breathing. *Id.* at 136. Cervantes testified that there was approximately $8.00 in quarters missing from his room. *Id.* at 141. Deputy Sheriff Dale Lotspeich investigated the crime scene at Navarro and Cervantes' residence on October 8, 1999. ECF No. 72-9 at 176, 189. Deputy Lotspeich testified that "[a] lot" of blood was found in the residence, with "[t]he primary areas of staining [being] in the living room and the master bedroom." *Id.* at 202-203.

Dr. Ellen Clark, a forensic pathologist, performed an autopsy on Navarro on October 9, 1999. ECF No. 72-10 at 25, 28. Navarro suffered from "blunt traumatic injury," including "injuries to the hands and the forearms, to the right leg, to the torso, and injuries aggregated over the face and on the head and scalp." *Id.* at 32. "Navarro died of craniocerebral or skull and brain

injuries due to blunt force trauma" from at least "six separate impacts to the face and the head." *Id.* at 46. Navarro's injuries were consistent with being hit by a metal baseball bat. *Id.* at 47.

Jeffrey Riolo, a criminalist, testified that Navarro's blood was found on a baseball bat, which had been discarded and later located following the attack. ECF No. 72-10 at 160-161, 174. Following their arrest, White and Woomer's shoes were tested, and Navarro's blood was found on both individuals' shoes. *Id.* at 174-175. Navarro's blood was also found on a blue and gold jacket located in White's vehicle. *Id.* at 175. Finally, Woomer's DNA was located under Navarro's fingernails. *Id.* at 179, 186.

White and Woomer drove to Battle Mountain, Nevada following their stay in Elko. ECF No. 72-9 at 142. While in Battle Mountain, White and Woomer encountered Nicole Dodge and her sister later in the day on October 8, 1999. ECF No. 72-11 at 55-56. Dodge testified that she walked to a store with White and Woomer, and White "went in and bought a soda." *Id.* at 58. White put on a black glove, "took a drink of the soda, then he passed the soda to [Woomer], and then [Woomer] dropped the soda" saying "'[t]here's blood.'" *Id.*

White turned himself into Santa Cruz, California law enforcement after learning that there was a warrant for his arrest. ECF No. 72-10 at 90. Thereafter, Detective Connie Bauers interviewed White. ECF No. 72-11 at 202-203. White explained that he and Woomer had stopped in Elko on their way to California and had gone to a bar the following morning. *Id.* at 206. At the bar, White and Woomer met a man, "and then this man bought beer, and the three of them proceeded to his house." *Id.* The three men continued drinking at the individual's house. *Id.* at 207. White eventually got sick and "went into the bathroom and vomited and then went into a back bedroom and laid down on the bed and passed out." *Id.* White was later "woken by Mr. Woomer saying that he had robbed this man. And [White] jumped up, run into the living room

where his tennis shoes were, put them on, and ran out the door." *Id.* As White "was running out

the door, he saw the victim laying by the door in the living room area." *Id.* White and Woomer

left the residence at the same time with Woomer carrying the bat. *Id.* at 217; ECF No. 72-12 at

21. Woomer discarded the bat following their exit from the house. ECF No. 72-12 at 21. White

and Woomer then "jumped in the car and drove about 50 miles to the next town." ECF No. 72-11

at 208. The next day, White proceeded to California without Woomer because "'[Woomer]

started bragging about robbing the guy.'" *Id.*; ECF No. 72-12 at 17. Before he left, White took

some money that Woomer had stolen from the individual's house. ECF No. 72-11 at 211. White

claimed that the blue and gold jacket found in his vehicle belonged to Woomer. ECF No. 72-12

at 14.

Before Woomer testified, an offer of proof was made outside the presence of the jury due

to "his alleged memory loss." ECF No. 72-11 at 4. The state district court indicated that it did not

"believe Mr. Woomer when he sa[id] that he d[id not] remember" events surrounding his actions

on October 8, 1999, and as such, the state district court determined that Woomer would testify

and be "available for cross examination." *Id.* at 107.

Thereafter, Woomer testified before the jury that he met a man at the Western Inn in Elko

on the morning of October 8, 1999. ECF No. 72-12 at 42, 49. Woomer and the man started

drinking vodka, and Woomer explained that "the rest [he did not] remember." *Id.* at 49. Woomer

testified that he did not remember telling the police that he went to a bar with White and this

individual, that they met Navarro at the bar, that Navarro was flirting with him, that he and

White went to Navarro's house, or that he told Navarro, "'[w]hy don't we do something for

money?'" *Id.* at 50-51. Woomer then testified that he did not tell the police that Navarro "started

kissing [him] and sucking on [his] neck," that he did not know whether he told the police that

1  "Navarro was going to pay [him] for allowing [Navarro] to perform oral sex on [him]," and that

2  he made up the story about "Navarro t[aking him] into his bedroom and perform[ing] oral sex on

3  [him]." *Id.* at 53-54. Woomer further testified that he made up the following stories to the police:

4  that he "started to feel nauseous and ran to the bathroom and vomited," that "while [he] was in

5  the bathroom [he] heard" White demand that Navarro give him money, and that he saw White

6  beating Navarro "with the baseball bat in the living room area." *Id.* at 55. Woomer also did not

7  remember telling the detectives that "White told [him] to search the house," that Navarro woke

8  up and "started to charge Mr. White," or that White hit Navarro "again in the head or the body."

9  *Id.* at 56-57, 59-60. Additionally, Woomer made up the story that he kicked Navarro, went

10  outside for several minutes to make sure it was clear, and then saw White discard the baseball bat

11  after they had left the residence. *Id.* at 60-61. Further, Woomer did not remember telling the

12  detective that White informed him at the bar that Navarro had a lot of money, that White told

13  him that he wanted to rob Navarro, or that White had his black glove on when they were at

14  Navarro's house. *Id.* at 66-67, 69.

15      Woomer testified that he "entered into an agreement to testify against Mr. White." *Id.* at

16  83. Woomer explained that his police interview on February 15, 2000 was taken before his

17  sentencing and he "knew what they were expecting to hear." *Id.* at 84-85. Woomer also

18  explained that witnesses who testify on behalf of the government "get killed" in prison. *Id.* at 52.

19  Finally, Woomer denied getting a tattoo in the Elko County Jail of a skull with a baseball bat,

20  claiming that the unfinished tattoo was a skull with a knife. *Id.* at 86.

21      **c.  Judge's letter**

22      Following White's trial, state district court Judge Jack Ames drafted a letter to Warden E.

23  K. McDaniel regarding Michael Woomer on December 4, 2000. ECF No. 114-2. Judge Ames

requested that his letter "be placed in Michael Woomer's permanent filed [sic] to be reviewed when he becomes eligible for parole." *Id.* at 2. Judge Ames then explained the following:

> I was the sentencing Judge for Mr. Woomer concerning a plea agreement which allowed Mr. Woomer to enter a plea of guilty to First Degree Murder. In exchange for his plea, the District Attorney agreed to drop an Enhancement Of Use Of A Deadly Weapon, Robbery With The Use Of A Deadly Weapon and 2 Counts of Conspiracy. Mr. Woomer agreed to testify truthfully against his co-defendant Jerry White.
>
> During Mr. White's trial, Mr. Woomer answered questions concerning events before and after the beating death and robbery of the victim but claimed a loss of memory of the actual events. In spite of Mr. Woomer, the jury found Mr. White guilty of First Degree Murder With The Use Of A Deadly Weapon, A Metal Baseball Bat, Robbery With The Use Of A Deadly Weapon, And Conspiracy To Commit Robbery. Although the District Attorney alleged four theories for First Degree Murder, I believe the jury was convinced of Mr. White's guilt based on the felony murder rule since the victim was beaten to death with a baseball bat during a robbery.
>
> During an Offer of Proof, outside the presence of the jury, Mr. Woomer stated he did not feel that there would be any consequence if he did not testify truthfully concerning the events of the murder. He further laughed at the reminder by counsel that he was under oath. The court agreed to impose a sentence of Life With The Possibility Of Parole for Mr. Woomer believing he was not the person that actually used the bat to beat the victim to death. However, DNA evidence, which was not available at the time of his sentencing, showed that Mr. Woomer's DNA was under the fingernails of the victim. Furthermore, Mr. Woomer lied at this sentencing when asked about a tatoo [sic] on his chest of a skull with a bat through it. Apparently, because it was a jail house tatoo [sic], the quality was such that allowed him to remove most of the tatoo [sic] so that it could not be confirmed at the time of sentencing. The actual artist, however, of the tatoo [sic] testified at Mr. White's trial to impugn Mr. Woomer's credibility.
>
> As the Presiding Judge, I now believe Mr. Woomer was instrumental in the use of the bat to kill the victim. Mr. Woomer violated his agreement to testify truthfully at the trial of Mr. White for which the Enhancement Of The Use Of A Deadly Weapon was dropped making Mr. Woomer eligible for parole in twenty (20) years rather than forty (40) years. Mr. Woomer told the court that nothing could be done to him for his refusal to carry out his agreement. Lastly, he lied to the court at the time of his sentencing.
>
> Mr. Woomer does not deserve to be released on parole one day sooner than Mr. White.

1   *Id.* at 2-3.

2             **d.**    **Woomer's post-trial confession**

3         On September 11, 2009, nearly ten years after the robbery and killing of Navarro and

4   nine years after White's trial, Woomer signed a declaration. ECF No. 72-2. In that declaration,

5   Woomer explained that after he and White went to Navarro's house, White eventually "went to

6   the bathroom where he threw up." *Id.* at 2. White "then went to lie down in the other bedroom

7   and passed out." *Id.* At that point, Navarro "began hitting on" Woomer, so Woomer "decided to

8   take his money." *Id.* When Navarro used the bathroom, Woomer retrieved White's baseball bat

9   out of their vehicle, and when Navarro exited the bathroom, Woomer "hit him on the head with

10  the baseball bat." *Id.* at 3. Woomer then searched Navarro's house for any money, located

11  approximately $750 under a mattress, and then went to find White. *Id.* After waking White,

12  Woomer "walked outside to smoke a cigarette while [White] was putting his shoes back on." *Id.*

13  "While [Woomer] was on the porch [he] noticed a neighbor watching [him]," so he "told [White]

14  to hurry up." *Id.*

15        Woomer explained that he was "making this statement for the first time because [he]

16  want[ed] to come clean" and felt that White "ha[d] gotten a raw deal in all of this." *Id.* Woomer

17  clarified that White "did not kill Ramon Navarro. He was passed out in another room of the

18  apartment when [Woomer] hit Ramon with the baseball bat." *Id.*

19        Thereafter, on February 4, 2011, an evidentiary hearing was held before state district

20  court Judge Andrew J. Puccinelli. ECF No. 95-18. Woomer testified that he was at the

21  evidentiary hearing "to hopefully get the truth out there, that Jerry White had nothing to do with

22  the murder that happened in 1999." *Id.* at 11-12. Woomer testified that he, White, and another

23  individual that he met in the lobby of their motel on the morning of October 8, 1999, went to a

bar and were drinking. *Id.* at 17-19. Navarro later "walked in[to the bar] and he was very, very flamboyant, buying everybody drinks" and "waving around a lot of cash." *Id.* Eventually White, Navarro, and Woomer left the bar and went to Navarro's house. *Id.* at 19-21. Woomer was wearing the blue and gold jacket. *Id.* at 19-20. When the three men arrived at Navarro's house, they drank some more. *Id.* at 22. After "[m]aybe half an hour" of drinking, White started getting sick and "went into the bathroom and threw up." *Id.* at 24-25. After getting sick, White "went into the other room and laid down." *Id.* at 25.

Navarro started flirting with Woomer, and Woomer "suggested that Mr. Navarro go freshen up." *Id.* When Navarro went to do so, Woomer "ran back to the car" and "grabbed a baseball bat out of the back seat." *Id.* at 26. Woomer explained that he intended to rob Navarro "[a]s soon as he started flirting overtly with [him] and making sexual innuendoes towards him." *Id.* When Woomer returned to the residence, Navarro gestured for them to enter Navarro's bedroom, and "[w]hen [Woomer] got to the bedroom, [he] pulled out the bat" and hit Navarro once in the head "[a]s soon as he crossed the threshold." *Id.* at 28. Navarro was rendered unconscious from the hit, and Woomer "started ransacking the bedroom" looking for money. *Id.* at 29. Woomer got irritated when he could not find any money, "[s]o [he] hit the door with the bat and [he] kicked over the dresser." *Id.* Navarro gained consciousness while Woomer was still in Navarro's bedroom. *Id.* at 30. Woomer ran into the living room, and Navarro followed him. *Id.* Woomer then hit Navarro with the baseball bat "maybe four" times in the head, torso, and legs. *Id.* Woomer then located approximately $715 under Navarro's bed. *Id.* at 32.

Woomer woke White, telling him that they needed to leave. *Id.* at 32-33. Woomer went outside to smoke a cigarette while White got dressed. *Id.* at 33. Woomer saw a neighbor watching him and, from the front stoop, told White to hurry up. *Id.* at 34. Woomer saw White

looking around the living room, "and he was kind of shocked at the scene." *Id.* at 37. White then picked up the baseball bat in the living room and exited the house. *Id.* at 37-38. Woomer took the baseball bat from White and "threw the bat over [a] fence." *Id.* at 38. Woomer and White then got into their vehicle and drove to Battle Mountain. *Id.* at 38-39. Thereafter, White "took the car and all moneys in the console" and left Woomer in Battle Mountain. *Id.* at 94.

After Woomer was arrested in Battle Mountain and transported back to Elko, Woomer was interviewed by police and "told them a bunch of lies that [he] made up" about White committing the crimes in order to protect himself. *Id.* at 45. Woomer explained that his testimony at the evidentiary hearing would not help him get parole. *Id.* at 49.

As indicating previously, before Judge Puccinelli could rule on White's petition, he passed away, so a second evidentiary hearing was held two and half years later before state district court Judge Nancy Porter on August 9, 2013. *See* ECF No. 95-34. Woomer testified again that he—not White—killed and robbed Navarro. *Id.* at 16, 18. Woomer explained that he, White, and Navarro walked to Navarro's house from the bar and started listening to music. *Id.* at 19. White "start[ed] to complain about being sick" and went to a bedroom to rest. *Id.* at 20. Navarro then "started touching on [Woomer] and kissing on [Woomer]," and as soon as Navarro went to the bathroom, Woomer went to retrieve a baseball bat out of White's vehicle. *Id.* at 22. Woomer had "planned to rob [Navarro] and take his money." *Id.* at 22. Woomer did not discuss this plan with White. *Id.* The next thing Woomer remembered was hitting Navarro with the bat in Navarro's bedroom. *Id.* at 24. Woomer did not remember how many times he hit Navarro. *Id.* Woomer looked for money throughout the house and then saw Navarro "coming out back into the living room." *Id.* at 25. Woomer struck Navarro with the baseball bat "several more times." *Id.* Woomer did not remember how many times he struck Navarro or where he struck him. *Id.*

17

1   Woomer then started searching for money again and eventually found some under Navarro's

2   bed. *Id.* at 26. Woomer woke White up in the other bedroom. *Id.* at 29. Woomer did not recall

3   who was holding the bat as he and White exited the house, but he remembered throwing it over a

4   fence. *Id.* at 30-31. When White and Woomer left, Navarro "was snoring in the corner." *Id.* at 31.

5          Woomer's memory during the second evidentiary hearing was weakened: among other

6   things, he did not remember how much money he took from Navarro's house, many details of

7   being at the bar, what happened in Battle Mountain, or what happened to the money he stole

8   from Navarro. *Id.* at 33-34. Woomer explained that he remembered more details when he signed

9   his declaration in 2009 and when he testified at the first evidentiary hearing in 2011. *Id.* at 34.

10  Woomer explained his memory issues: "My memory has blocked it out. It was a very terrible

11  and heinous thing that I committed, and I don't really want to recall it anymore." *Id.* at 80.

12         Woomer explained that he reached out to the Federal Public Defender's Office in 2008

13  because he wanted "the truth . . . to come out." *Id.* at 39. Woomer also explained that his trial

14  testimony was not entirely truthful because he "was basically being very, very manipulative

15  because [he] knew that what [he] got out of it was a lesser time." *Id.* at 47.

16         **2.    Discussion**

17         The Supreme Court has not yet recognized a freestanding "actual innocence" claim as a

18  constitutional claim. *See, e.g., McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not

19  resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of

20  actual innocence."); *Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016) ("The Supreme

21  Court has never recognized 'actual innocence' as a constitutional error that would provide

22  grounds for relief without an independent constitutional violation."). However, if a freestanding

23

18

1  actual innocence claim is cognizable, in order to be successful on such a claim, a petitioner

2  would be required to show:

> 3  a truly persuasive demonstration of "actual innocence" . . . [and] because of the very disruptive effect that entertaining claims of actual innocence would have on
> 4  the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold
> 5  showing for such an assumed right would necessarily be extraordinarily high.

6  *Herrera v. Collins*, 506 U.S. 390, 417 (1993). This "contemplates a stronger showing than

7  insufficiency of the evidence to convict" or "doubt about his guilt." *Carriger v. Stewart*, 132

8  F.3d 463, 476 (9th Cir. 1997). Under these standards, a petitioner must "affirmatively prove

9  that he is probably innocent." *Id.* Additionally, "*Herrera* requires more convincing proof of

10 innocence than" the actual-innocence standard applied in *Schlup v. Delo*, 513 U.S. 298 (1995),

11 for overcoming a procedural bar. *House v. Bell*, 547 U.S. 518, 555 (2006).

12        To be sure, Woomer has substantial credibility issues. Indeed, Woomer has given six

13 different accounts of the events that occurred on October 8, 1999: (1) during his October 10,

14 1999, police interview, Woomer blamed White for Navarro's robbery and murder; (2) during

15 his February 15, 2000, police interview, Woomer again blamed White for Navarro's robbery

16 and murder but with slightly different details; (3) during his November 15, 2000, trial

17 testimony, Woomer could not remember the relevant events surrounding Navarro's robbery and

18 murder; (4) in his September 11, 2009, declaration, Woomer indicated that he robbed and

19 murdered Navarro; (5) during his February 4, 2011, post-conviction evidentiary hearing

20 testimony, Woomer again indicated that he robbed and murdered Navarro, but this testimony

21 contained more detail than he included in his September 11, 2009, declaration; and (6) during

22 his August 9, 2013, second post-conviction evidentiary hearing testimony, Woomer indicated

23 that he robbed and killed Navarro, but he could not remember all the details he had provided in

his previous post-conviction evidentiary hearing testimony on February 4, 2011. Despite these credibility issues, Woomer's post-trial confession that he robbed and murdered White *may*, in fact, be true.

The evidence at trial connecting White to Navarro's robbery and murder—other than Woomer's allegations against White—was limited to blood on one of White's shoes, blood on a jacket found in White's vehicle, the neighbor's testimony that White carried the baseball bat out of Navarro's house, and the fact that White had cash on him after Navarro was murdered. However, most of this evidence at trial *could be* consistent with both White's original police interview statement and with Woomer's post-trial confession that White was passed out during the robbery and murder and did not partake in either.

First, White told law enforcement that he was "woken by Mr. Woomer saying that he had robbed this man," so he "jumped up, r[a]n into the living room where his tennis shoes were, put them on, and ran out the door." ECF No. 72-11 at 207. Similarly, in his declaration, Woomer explained that after he woke White, he "walked outside to smoke a cigarette while [White] was putting his shoes back on." ECF No. 72-2 at 3. The location of White's shoes in Navarro's living room, where Navarro's blood was later found, could explain the presence of Navarro's blood on his shoe even if White was passed out in a bedroom during the robbery and murder.

Second, White told law enforcement that the blue and gold jacket found in his vehicle belonged to Woomer. ECF No. 72-12 at 14. And Woomer testified at the first post-conviction evidentiary hearing that he was wearing the blue and gold jacket on October 8, 1999. ECF No. 95-18 at 19-20. As such, the finding of the jacket with Navarro's blood on it in White's vehicle could be consistent with Woomer having worn it during the attack and then having left it in White's vehicle during the drive to Battle Mountain.

20

Third, White told law enforcement that the baseball bat belonged to him and that Woomer "had the bat" when they left Navarro's residence before Woomer discarded it. ECF No. 72-5 at 11-12. Contrarily, Woomer testified at the first post-conviction evidentiary hearing that while he was waiting outside of Navarro's house for White to put his shoes on, he saw White look around the living room in shock and then pick up the baseball bat in the living room and exit the house. ECF No. 95-18 at 37-38. Woomer testified that he then took the baseball bat from White and "threw the bat over [a] fence." *Id.* at 38. Woomer also testified that the "archaic aluminum bat" had sentimental value to White. *Id.* at 89. Although White denied carrying his baseball bat out of the residence before Woomer discarded it, the fact that a neighbor saw him carrying it out of the residence could be explained by the fact that he simply grabbed it as he was exiting the house due to it having sentimental value for him.

Fourth, White told law enforcement that he left Woomer in Battle Mountain and proceeded to California without him, but before he left, White took some money that Woomer had stolen from Navarro's house. ECF No. 72-11 at 211. And Woomer testified at the first post-conviction evidentiary hearing that White "took the car and all moneys in the console" and left him in Battle Mountain. ECF No. 95-18 at 94. Thus, the fact that White had money could be explained by the fact that he simply took the money from Woomer who had previously taken it from Navarro.

In addition to this trial evidence which could be consistent with White's statement to law enforcement and Woomer's post-trial confession, much of the other evidence at trial supported Woomer's guilt in the robbery and murder: Woomer's DNA was located under Navarro's fingernails, Navarro's blood was found in Woomer's shoe, and Woomer allegedly received a tattoo in the Elko County Jail of a skull with a baseball bat. ECF No. 72-10 at 174-175, 179, 186;

1    ECF No. 72-12 at 86. Additionally, the state district court judge who presided over White's trial

2    and Woomer's plea and sentencing indicated, following White's trial, that it "believe[d] Mr.

3    Woomer was instrumental in the use of the bat to kill the victim." ECF No. 114-2 at 2-3.

4         There is other significant evidence supporting the credibility of Woomer's post-trial

5    confession. Woomer was sentenced to life with the possibility of parole after twenty years on

6    March 30, 2000. ECF No. 72-8 at 3. Woomer's declaration confessing to the robbery and murder

7    was signed on September 11, 2009, at least eleven years before he was eligible for parole.

8    Confessing to the robbery and killing of Navarro before he was eligible for parole weighs against

9    a finding of incredibility on Woomer's part. Moreover, Woomer had a motive to lie during his

10   police interview statements. As he explained at the post-conviction evidentiary hearings, he lied

11   to protect himself because he knew he would get "a lesser time" in prison if he put the blame on

12   White. ECF No. 95-18 at 45; ECF No. 95-34 at 47. In fact, Woomer was able to avoid additional

13   convictions for robbery with the use of a deadly weapon, conspiracy to commit open murder

14   with the use of a deadly weapon, conspiracy to commit robbery with the use of a deadly weapon,

15   and a deadly weapon enhancement for first-degree murder in return for a second police interview

16   and testifying against White. *See* ECF No. 72-7. Accordingly, the entire record, viewed as a

17   whole, supports a finding that Woomer's post-trial confession absolving White of any guilt

18   associated with the robbery and murder were potentially more credible than his police interview

19   statements ten years earlier.

20        However, similar to the facts in *Carriger*, White has not presented any evidence beyond

21   Woomer's post-trial confession to affirmatively prove his innocence. *See Carriger*, 132 F.3d

22   463, 477 (9th Cir. 1997) ("Carriger has presented no evidence, for example, demonstrating he

23   was elsewhere at the time of the murder, nor is there any new and reliable physical evidence,

such as DNA, that would preclude any possibility of Carriger's guilt."). In *Carriger*, the Ninth

Circuit concluded that Carriger's freestanding actual innocence claim failed because "[a]lthough

[the] confession exonerating Carriger d[id] constitute some evidence tending affirmatively to

show Carriger's innocence, we cannot completely ignore the contradictions in [the confessor's]

stories and his history of lying," and as such, "the confession by itself falls short of affirmatively

proving that Carriger more likely than not is innocent." *Id.*

      Woomer's previous stories demand the same result here: Woomer's post-trial confession

only "constitute[s] some evidence tending affirmatively to show" White's innocence. *Id.* Without

more, Woomer's post-trial confession, which was preceded by a history of lying, is insufficient

to show that White is actually innocent. Indeed, Woomer and White, who were traveling together

from Ohio to California with insufficient funds, were the only two individuals in the house with

Navarro when Navarro was robbed and murdered, and Woomer and White each originally

pointed the finger at the other person. At one point, each individual claimed to be ill or passed

out in a different room while the other committed the heinous acts against Navarro. Therefore,

although Woomer's post-trial confession is similar to White's police interview statements

thereby aligning their two stories of what happened to Navarro on October 8, 1999, Woomer's

post-trial confession, which is plausible as best, falls short of affirmatively proving White's

innocence.

      Accordingly, even if a freestanding actual-innocence claim is available in noncapital

habeas proceedings, White has not presented "a truly persuasive demonstration of 'actual

innocence.'" *Herrera*, 506 U.S. at 417. Thus, the Nevada Supreme Court's conclusion that the

1 | state district court did not err in denying White's freestanding claim of actual innocence was

2 | reasonable. White is denied federal habeas relief for Ground 1.[4]

3 | **Certificate of Appealability**

4 |     This is a final order adverse to White. As such, Rule 11 of the Rules Governing Section

5 | 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Therefore,

6 | this court has *sua sponte* evaluated the claim within the petition for suitability for the issuance of

7 | a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

8 | Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

9 | substantial showing of the denial of a constitutional right." With respect to claims rejected on the

10 | merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

11 | assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473,

12 | 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

13 |     Applying these standards, this court finds that a certificate of appealability is warranted.

14 | Although Woomer has credibility issues, the evidence presented at trial, which could be

15 | consistent with Woomer's post-trial confession and White's original police interview statements,

16 | could cause debate among reasonable jurists whether Woomer's post-trial confession constituted

17 | only some—rather than sufficient—evidence tending affirmatively to show White's innocence.

18 | Indeed, reasonable jurists could determine that Woomer's post-trial confession that he robbed

19 |

20 |     [4] White requests that this court "[c]onduct an evidentiary hearing at which proof may be

21 | offered concerning the allegations in [his] amended petition and any defenses that may be raised by respondents." ECF No. 103. White fails to explain what evidence would be presented at an evidentiary hearing, especially since two evidentiary hearings were held before the state district

22 | court on White's state habeas petition. Additionally, this court has already determined that White is not entitled to relief, and neither further factual development nor any evidence that may be

23 | proffered at an evidentiary hearing would affect this court's reasons for denying relief. Accordingly, White's request for an evidentiary hearing is denied.

1 | and murdered Navarro while White was passed out amounted to a "a truly persuasive

2 | demonstration of 'actual innocence,'" pursuant to *Herrera*. 506 U.S. at 417.[5]

3 | **Conclusion**

4 | IT IS HEREBY ORDERED that the Amended Successor Petition for Writ of Habeas

5 | Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (ECF No. 103) is DENIED.

6 | IT IS FURTHER ORDERED that Petitioner is granted a certificate of appealability for

7 | Ground 1.

8 | IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment

9 | accordingly.

10 | Dated: May 18, 2020

11 | _____

12 | Gloria M. Navarro, Judge
United States District Court

---

22 | [5] The parties made several arguments and cited to several cases not discussed above. This court has reviewed these arguments and cases and determined that they do not warrant
23 | discussion.